**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| J.H. and D.J., | : | CIVIL ACTION |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, <u>et al.</u>, | : | No. 06-2220 |
| Defendants | : | |

## <u>MEMORANDUM AND ORDER</u>

GENE E.K. PRATTER, J.                                                          AUGUST 19, 2008

One indisputable goal of an organized and compassionate society is to endeavor to

provide every child with a safe and nurturing environment – even if that environment is provided

by caregivers other than the child's parents.  This case arises from an apparent failure of the

community to achieve that goal for J.H.  More precisely, the Court has been presented with the

question of whether every failure of the foster care system translates to an actionable federal

claim against the municipal overseer of that system.  Here, based upon the narrowly articulated

faces of this case, the Court concludes that the municipality is not constitutionally required to be

prescient as long as it is not negligent.

J.H. alleges grave abuse at the hands of his former foster parents.  J.H. and his adoptive

father, D.J., commenced this action pursuant to 42 U.S.C. § 1983,[1] alleging that the City of

---

[1]D.J., through counsel, acknowledged during the oral argument conducted on June 4,
2008 that he was no longer pursuing his claims against the City of Philadelphia or Tabor
Children's Services, Inc.  N.T. 6/4/08 at 4:50-51.  Therefore, the Court will not address D.J.'s
allegations except as they may relate to or explain J.H.'s claims.  As a result of D.J.'s
acknowledgment, the Court granted Tabor Children's Services' motion for summary judgment as
to D.J.'s claims on June 5, 2008, <u>see</u>, Doc. No. 41, and today grants the City of Philadelphia's

Philadelphia ("City") and Tabor Children's Services, Inc. ("Tabor") violated J.H.'s constitutional rights by allowing him to be physically and sexually abused while in the foster care of M. and R. Holmes.  The City has moved for summary judgment which J.H. opposes.  For the reasons set forth below, the Court will grant the City's Motion.

## I. LEGAL STANDARD

Upon motion of a party, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  Summary judgment may be granted only if the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).  An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue. See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A fact is "material" only if it could affect the result of the suit under governing law. Id.

Evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).  If, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate. Celotex Corp. v. Catrett, 477

---

motion for summary judgment as to D.J.'s claims.

U.S. 217, 322 (1986); Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).

The party opposing summary judgment must support each essential element of that party's opposition with concrete evidence in the record.  Celotex, 477 U.S. at 322-23.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (citations omitted).  This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."  Walden v. Saint Gobain Corp., 323 F. Supp. 2d 637, 642 (E.D. Pa. 2004) (citing Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976)).


## II. BACKGROUND

To describe the background of this case, the Court sets out those facts of record that are undisputed.  Moreover, they are construed in the light most favorable to J.H., the non-moving party.  Nonetheless, the Court must disregard those factual allegations that J.H. makes without any evidentiary support from the record.  See, Celotex, 477 U.S. at 322-23; Jones v. United Parcel Service, 214 F.3d 402, 407 (3d Cir. 2000) (requiring more than "unsupported allegations" to defeat summary judgment).  The following factual recitation separately notes those instances where J.H. disputes factual contentions made by the City, but provides no evidentiary basis from the record for those disputes, and, in that case, the City's factual contentions are treated as undisputed.  See, Blaylock v. City of Philadelphia, 504 F.3d 405, 413 (3d Cir. 2007) (citing Anderson) (when the record contradicts a party's description of the facts, it does not create a genuine dispute).  The Court has accepted as true all other factual contentions made by

3

J.H. and construed them in the light most favorable to him.

Tabor contracts with government agencies throughout Pennsylvania to provide foster care, adoption and other related services to nearly 3,700 clients.  Specifically, Tabor contracts with the City to oversee foster care placements, including J.H.'s placement with Mr. and Mrs. Holmes.  Tabor employees attend court hearings related to foster children, make regular home visits, monitor foster children's school attendance, provide resources to foster families, and conduct other day-to-day oversight of foster placements.  The company provides the City with monthly reports on each child.  The City reviews those reports and conducts its own semi-annual visits to each foster home.

J.H. was born on May 3, 1987, and was placed into the foster care system on March 17, 1992, when he was four years old.  On November 28, 1995, Tabor placed J.H. in the foster home of M. and R. Holmes.

J.H. contends that Mr. and Mrs. Holmes physically and sexually abused him.  The alleged sexual abuse took place when J.H. was eight years old.  He asserts that Mrs. Holmes would watch and touch him while he bathed.  Plaintiffs' Answer to Defendant City's Motion for Summary Judgment ("Response"), Ex. 1; Defendant City's Motion for Summary Judgment ("Phila. MSJ"), Ex. C at 65-66, 68 ("J.H. Dep.").  He also alleges that Mr. Holmes "grinded" against him in a sexual manner on two occasions.  Id. at 66-67.  J.H. allegedly reported this conduct to Tabor, but not to the City.  See, Response, Ex. 2; Phila. MSJ, Ex. H at 74, 172 ("D.J. Dep.");  J.H. Dep. at 62-64, 85-86, 93, 190 (indicating that J.H. told his Tabor social worker that he was being locked in the basement and sexually abused).

J.H.'s responses to discovery indicate that "[w]hen J.H. told several counselors from Tabor that he was being abused by his foster parents, Tabor brushed it off and did not file a

complaint or notify DHS."  Phila. MSJ, Ex. F (Tabor Interrog. to J.H. No. 14); id, Ex. G (J.H.'s Resp. to Tabor Interrog. No. 14).  However, after J.H. reported the alleged abuse to Tabor social workers and therapists, J.H. Dep. at 62-67, 72-74, 79-81, 94-95, 160-161, Plaintiff does not dispute that it was the Tabor employees' responsibility to inform the City of J.H.'s allegations of abuse.  Response, Ex. 4 at 23-29 ("Brooks Dep."); Response, Ex. 5 at 25-28 ("Wright Dep.").

During a mental health assessment interview in March 1998, J.H.'s brother alleged that Mrs. Holmes physically abused J.H. and another child in the home.  J.H.'s brother said that Mrs. Holmes hits "the children when they are bad or when they do not follow the rules."  Phila. MSJ, Ex. D ("Incident Report").  J.H.'s brother also said that Mrs. Holmes hit him.  The report indicates that "J also confirmed that Mrs. Holmes beats [N] when he is bad."  Id.  The psychologist reported the incident to the Pennsylvania Department of Public Welfare's child abuse prevention hotline.

Although the Department of Public Welfare ("DPW") did not investigate the report, Tabor's Cluster Director and the City did look into the allegations.  During the investigation, J.H. first stated that he "sometimes gets hit," but later he denied being abused and denied telling his brother that Mrs. Holmes hit him.  Phila. MSJ, Ex. E (Tabor Casenote Log April 2, 1998).  When City caseworker Josie Miller spoke with J.H. on April 7, 1998, he denied being hit and said that he wanted to be adopted by Mr. and Mrs. Holmes.  Id.  The investigation into the matter was subsequently closed by both the City and Tabor.

J.H.'s file contains no additional references to any claims of abuse by or other negative reports about Mr. or Mrs. Holmes during the years that J.H. lived in their home even though he now asserts that he repeatedly told Tabor caseworkers that Mr. and Mrs. Holmes abused him. See, J.H. Dep. at 62-67, 72-74, 94-95, 160-161.  All parties agree that the City was informed of

only one allegation of abuse, namely, J.H.'s brother's allegation, which the City investigated and found unsubstantiated.

## III. DISCUSSION

### A.    J.H.'s Non-Due Process Claims

J.H. acknowledges that the City is immune with respect to all of his claims arising under state law, that he cannot recover monetary damages from the City for violations based upon state constitution violations, and that he cannot recover punitive damages from the City.  <u>See</u>, Response ¶¶ 53-55.

Accordingly, the Court grants as unopposed summary judgment for the City as to all such claims made by J.H., except those claims characterized as being made pursuant to the Due Process Clause.

### B.    J.H.'s Due Process Claims

J.H. has asserted due process claims against the City pursuant to the so-called special relationship doctrine, the state-created danger doctrine, and a failure to train or supervise theory. For the reasons set forth below, the Court also must grant summary judgment for the City on all due process claims.

#### i.    The Standard for Imposing § 1983 Municipal Liability

Municipalities cannot be held vicariously liable pursuant to 42 U.S.C. § 1983 because under this statute there is no <u>respondeat</u> <u>superior</u> liability for the actions of municipal agents. <u>Sanford v. Stiles</u>, 456 F.3d 298, 314 (3d Cir. 2006) (citing <u>Monell v. Dept. of Soc. Serv.</u>, 436

U.S. 658, 691 (1978)) "[A] municipality may be held liable only if its policy or custom is the 'moving force' behind a constitutional violation." Id. Thus, it is not enough to show that a constitutional violation has occurred. To establish liability, the plaintiff must prove that the violation was the result of a municipal policy or custom. Id.

The existence of a policy or custom can be established one of in two ways, namely, (1) by showing that a "'decisionmaker possessing final authority to establish municipal policy with respect to the action' issued an official statement of policy," Jiminez v. All American Rathskeller, 503 F.3d 247, 250 (3d Cir. 2007) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)), or (2) by demonstrating that a "custom" exists "when, though not authorized by law, the 'practices of state officials [are] so permanent and well settled' that they operate as law." Id. (quoting Monell, 436 U.S. at 690).

Acts of a government employee[2] can be deemed to be the result of a policy or custom in three situations:

> The first is where the appropriate officer or entity promulgates a generally acceptable statement of policy and the subsequent act complained of is simply an implementation of that policy. The second occurs where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself. Finally, a policy or custom may also exist where a policymaker has failed to act affirmatively at all, but the need to take some action is so obvious, and the inadequacy of the existing practice so likely to result in the violation of constitutional rights that the policymaker can reasonably be said to have been deliberately indifferent to the need.

Jiminez, 503 F.3d at 250 (citing Natale v. Camden County Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003)). The determination of who qualifies as a policymaker requires the Court to

---

[2] Foster parents are not state actors within the meaning of § 1983. Leshko v. Servis, 423 F.3d 337, 347 (3d Cir. 2005). Accordingly, the City cannot under any argument be held legally responsible under § 1983 for the acts of the Holmeses and, of course, the Holmeses themselves cannot be pursued by way of this law.

"determine which official has final, unreviewable discretion to make a decision or take action."
Kneipp v. Tedder, 95 F.3d 1199, 1213 (3d Cir. 1996) (citation omitted).  "Policymakers have the
authority to make decisions which constrain the discretion of their subordinates."  Pearson v.
Miller, 988 F. Supp. 848, 858 (M.D. Pa. 1997).

There must be a "direct causal link" between the policy or custom and the constitutional
violation.  Sanford, 456 F.3d at 314.  Where the policy at issue is not itself unconstitutional, a
plaintiff will need "considerably more proof than a single incident...to establish both the requisite
fault on the part of the municipality, and the causal connection between the 'policy' and the
constitutional deprivation."  City of Oklahoma City v. Tuttle, 471 U.S. 808, 824 (1985) (plurality
opinion).

To establish a constitutional violation, the defendant's conduct must shock the
conscience.  Nacini v. Morra, 212 F.3d 798, 812 (3d Cir. 2000).  In the foster care context, non-
emergency decisions may indeed shock the conscience if they are done with deliberate
indifference.  Id. at 811.  However, merely negligent acts do not implicate the Due Process
Clause.  Brown v. Commw. of Pennsylvania Dept. of Health Emergency Medical Serv. Training
Inst., 318 F.3d 473, 479 (3d Cir. 2003).  Similarly, "indefensible passivity" and "nonfeasance"
are insufficient to give rise to a constitutional violation.  Id. (citing D.R. v. Middle Bucks Area
Vocational Tech. Sch., 972 F.2d 1364, 1376 (3d Cir. 1992)).  Accordingly, a plaintiff must
"show that a state actor acted with deliberate indifference to a known or obvious danger."  Id.
(citing Morse v. Lower Merion Township, 132 F.3d 902, 910 (3d Cir. 1997)).

Only if the Court in the words of J.H.'s own counsel, "push[ed] the envelope" of these
general propositions of § 1983 law with a host of speculations – which the Court is obliged to

decline to do – could the City be potentially liable here.[3]

ii.    **Whether the City Had a Custom or Policy That Resulted in a Constitutional Violation Due to the City's Deliberate Indifference to a Known Risk**

The Due Process Clause generally confers no affirmative right to governmental aid, even where the aid may be necessary to secure life, liberty or property interests of which the government itself may not deprive any individual. Brown, 318 F.3d at 477. However, J.H. contends that the City had a due process duty to protect him from abuses by Mr. and Mrs. Holmes by application of the special relationship doctrine and state-created danger doctrine. The special-relationship doctrine is implicated when a state restrains an individual so as to expose him to harm. The state-created danger doctrine applies, even absent a special relationship, where a state, through some affirmative conduct, places an individual in a position of danger. See, id. at 477-78. J.H. also seeks to hold the City liable for deliberately and recklessly maintaining a custom, practice or policy that caused him harm.

The City argues that the analysis of each of J.H.'s theories of liability establishes that J.H.'s evidence fails to create a genuine issue of fact with respect to these claims. J.H. asserts that the facts are in dispute as to each of his three theories of liability, and, therefore, the City's summary judgment motion cannot succeed with respect to J.H.'s due process claims.

a.    **Special Relationship Doctrine**

---

[3]Further, Plaintiff's counsel acknowledged during the oral argument that "[P]laintiff, in some respects, is asking the Court to speculate that more closely monitoring the situation may have had a different outcome with regard to the relationship between the Holmes[es] and J.H." Tr. 6/4/08 at 27:19-22. Plaintiff has offered no evidence of causal connections between City policy or custom and the harm J.H. allegedly suffered. The Court may no more speculate about causal links than it may "push the envelope" against authoritative precedent.

When a state places a child in state-regulated foster care, the state's restraint on the child's freedom imposes a duty on the state to provide basic care for the child as well as protection from harm at the hands of state-regulated foster parents.  Nicini v. Morra, 212 F.3d 798, 807-808 (3d Cir. 2000) (en banc).  The state cannot avoid its responsibilities in this regard by delegating its custodial responsibilities to private parties.  Andrea L. v. Children and Youth Services of Lawrence County, 987 F. Supp. 418, 421-22 (W.D. Pa. 1997).

Special relationship doctrine analysis involves several steps.  First, the Court must determine whether J.H. has alleged a protected interest and a sufficient relationship with the City to state a cause of action.  Nicini, 212 F.3d at 809.  Next, the Court must determine whether the alleged violation amounted to a violation of J.H.'s constitutional rights.  Id.  To do that, the Court has to identify the "level of conduct egregious enough to establish a constitutional violation," and must determine whether there is sufficient evidence to establish that the City's conduct rose to that level.  Id.  For the conduct to amount to a constitutional violation, it must be so egregious as to shock the conscience.  Id. at 810.  In order to shock the conscience with respect to non-emergency decisions made in the foster care context, the City must have acted with deliberate indifference.  Id.

In the context of a claim for municipal liability, the Court must engage in an additional analysis to determine if the constitutional violation was the result of a municipal policy or custom.  J.H. must prove either that: (1) a municipal policy of custom caused the underlying constitutional violation by D.H.S. employees; or (2) a municipal policy or custom itself, without conduct by state actors, caused a substantive due process violation.  See, M.B. v. City of Philadelphia, No. 00-5223, 2003 U.S. Dist. LEXIS 2999, at *17-19 (E.D. Pa. March 3, 2003) (Monell analysis in the context of the analysis of a state-created danger claim).

10

For the purposes of its motion, the City concedes that, as a child in foster care, J.H. had a constitutional liberty interest in basic physical safety arising from being in foster care.  This right included the right not to be handed over by state officials to a foster parent whom the state knew or suspected to be a child abuser.  See, Andrea L., 987 F. Supp. at 424.  However, the City argues that "[e]ven if there is evidence the Mr. and Mrs. Holmes abused J.H., there is no evidence that the City was aware of this alleged abuse."  Phila. MSJ at 11.  Accordingly, the Court must determine if an issue of material fact remains as to whether J.H. suffered a constitutional violation and whether any such violation was the result of a municipal policy or custom.

The City asserts that only one incident of alleged abuse by Mrs. Holmes is at issue in this case, i.e., the only allegation of abuse of which the City was aware during J.H.'s tenure in foster care.  This alleged incident was the one J.H.'s brother reported to his psychologist in March 1998 to the effect that J.H. was being physically abused by his foster mother and that she "hits the children when they are bad or when they do not follow rules."  Phila. MSJ, Ex. D ("Incident Report").  The psychologist reported the incident to the Pennsylvania Department of Public Welfare's child abuse prevention hotline.  The D.P.W. did not investigate the report, but Tabor's Cluster Director investigated the allegations.  During the investigation, J.H. initially stated that he "sometimes gets hit," but later he denied being hit and denied telling his brother that Mrs. Holmes hit him.  Phila. MSJ, Ex. E (Tabor Casenote Log April 2, 1998).  When City caseworker Josie Miller spoke with J.H. on April 7, 1998, he denied being hit and said that he wanted to be adopted by Mr. and Mrs. Holmes.  Id.  The incident report was thereafter closed.  The parties agree that there are no other references in J.H.'s D.H.S. file to any claims of abuse by either Mr. or Mrs. Holmes during the years that J.H. lived with them.

The City argues that this March 1998 "isolated, unsubstantiated report is insufficient, as a

11

matter of law, to provide notice to City policymakers that M. and R. Holmes were abusing J.H." Phila. MSJ at 12.  See, Gremo v. Karlin, 363 F. Supp. 2d 771, 784 (E.D. Pa. 2005) (discussing D.R. v. Middle Bucks Area Vocational Tech. Sch., 972 F.2d 1364 (3d Cir. 1992) and stating that a student's uncorroborated accusation of an attempted molestation did not rise to the level of actual awareness of the risk sufficient to hold the defendants constitutionally liable).

The City asserts that should the Court conclude that the report was sufficient to provide notice to the City, the evidence establishes that the incident was investigated and found to be unsubstantiated.  Because there is no evidence that the investigation itself was a sham, the City argues that there is no evidence that the City acted with deliberate indifference.

This case does not present a situation where the City substantiated allegations of abuse then failed to act.  Rather, here, the City learned of an allegation of abuse, conducted an investigation, and concluded that the allegation was unsubstantiated.  As a matter of law this circumstance cannot be characterized as evidence of deliberate indifference inasmuch as the City did respond to the allegation of abuse (including receiving J.H.'s own assurances about his then-foster parents together with other information) and not unreasonably concluded that J.H.'s brother's accusations were unfounded.

However, even if there was sufficient evidence to create an issue of disputed fact regarding a potential violation of J.H.'s rights under the special relationship doctrine, the City argues that this claim still must fail because there is no evidence of a municipal policy or custom that caused the City to violate J.H.'s due process rights.

The City's policy in this arena is to delegate daily oversight of foster children to contracted agencies.  The City then monitors those agencies' reports and conducts home visits for each foster child every six months.  J.H. asserts that this policy is insufficient and led to his

12

continued abuse at the hands of the Holmeses.  He argues that following any allegation of abuse (founded or unfounded) from any source, the City should routinely increase its monitoring of a foster child for at least a few months.  See, Tr. 6/4/08 at 20:8-19.  Counsel for J.H. admits that to constitutionally require such a policy would require the Court to "push the envelope." Not only is there no precedent for demanding such a policy, but the Court cannot help but express concern that such a requirement could all too easily result in useless deployment of personnel to investigate deliberate or even good faith cries of "wolf," thereby further exhausting scarce resources undeniably needed elsewhere.  Accordingly, the Court finds that J.H.'s due process claim under the special relationship doctrine must fail.

### b.      State-Created Danger Doctrine

Liability under the state-created danger doctrine attaches when the state "acts to create or enhance a danger that deprives" a person of substantive due process rights guaranteed by the Fourteenth Amendment.  Sandford v. Stiles, 456 F.3d 298, 304 (3d Cir. 2006).  To prevail with such a claim, a plaintiff must prove that:

> 1) the harm ultimately caused was foreseeable and fairly direct;
> 2) a state actor acted with a degree of culpability that shocks the conscience;
> 3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
> 4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

Id. at 304-05.

For municipal liability to attach, the plaintiff must prove both that a violation of due process under the state-created danger doctrine occurred, and that municipal liability is warranted

13

under a <u>Monell</u> analysis.  <u>See</u>, <u>e.g.</u>, <u>M.B.</u>, 2003 U.S. Dist. LEXIS 2999, at *19 (discussing allegations of sexual abuse in a foster home and stating that in municipal liability cases, the state-created danger theory analysis and the <u>Monell</u> analysis should be separately conducted).

For the purposes of its motion, the City concedes that there is sufficient evidence to create a question of fact with respect to the third element.  Accordingly, only the first, second and fourth elements are discussed below.

### 1.      Evidence that the Harm Caused Was Foreseeable and "Fairly Direct"

The first prong addresses the foreseeability of the harm caused by the purported constitutional violation.  "[A] harm is foreseeable when a state actor has actual [knowledge or] awareness, based on concrete information, of a risk of harm to an individual or class of individuals such that the actor is on notice that his or her act or failure to act significantly enhances the risk of harm."  <u>Gremo</u>, 363 F. Supp. 2d at 784-85.  The "level of awareness on the part of the state actors" must rise "to the level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm."  <u>Id.</u>

The City cites two cases in support of its argument that the harm J.H. suffered was not foreseeable: <u>Kneipp v. Tedder</u>, 95 F.3d 1199 (3d Cir. 1996) and <u>Morse</u>, 132 F.3d 902.  In <u>Kneipp</u>, a police officer separated an intoxicated woman from her husband and then left her outside alone at night.  The woman subsequently fell down an embankment and suffered an injury.  The court held that ordinary common sense made the risk of harm in that scenario foreseeable.  The officer's awareness of the woman's intoxication and her inability to walk without assistance provided concrete information to put him on notice that his actions

14

significantly increased the risk of harm to the woman.  95 F.3d at 1208.

In contrast, Morse presents a case of unforeseeable harm.  In Morse, school officials acted inconsistently with school policy to allow contractors to prop open a back door to a school building during construction.  A deranged woman who had been seen loitering near the school the week before the incident came into the school and shot a teacher.  The complaint did not allege that the school officials were aware of the deranged woman's violent tendencies, or of any other individual posing a threat of violence to persons inside the school, or of any prior instances when a mentally ill person had entered the building.  132 F.3d at 909.  The court in Morse held that the complaint did not raise an issue of foreseeability because even if the defendants were aware of the woman's presence in the area, the facts were insufficient to put the defendants on notice that she would return several days later with a gun and shoot a teacher.  Id.  The court found that even had the woman entered the building through the open back door, causation was too attenuated to avoid dismissal.  The court concluded that there was no set of facts under which the plaintiff could prove a direct causal connection between the attack and allowing the door to remain open during construction.  Id.

The City argues here that there is insufficient evidence to create a question of fact as to whether the City had notice the Mr. and Mrs. Holmes would abuse J.H.  The isolated, unsubstantiated 1998 report to Tabor as the City's agent that Mrs. Holmes was hitting J.H. was insufficient to provide notice of a risk of harm to J.H. inasmuch as the City actually did investigate that allegation, and concluded that it was unfounded.  The City was unaware of any other allegation of abuse or mistreatment.  Accordingly, the Court must conclude that City did not have ample reason to foresee that J.H. would be at risk at the hands of his foster parents.

15

2.      **Whether the City's Conduct Shocks the Conscience**

A defendant's conduct must shock the conscience in order for it to form the basis for a constitutional violation.  Nacini v. Morra, 212 F.3d 798, 812 (3d Cir. 2000).  In the foster care context, non-emergency decisions may meet this criteria if they are done with deliberate indifference.  Id. at 811.  Under this standard, municipal foster care defendants cannot be held liable unless they know of and disregard an excessive risk to a foster child's health and safety. See, Farmer v. Brennan, 511 U.S. 825, 837 (1994) (under a deliberate indifference standard challenging prison conditions, "a prison official cannot be found liable...unless the official knows or and disregards an excessive risk to inmate health and safety....")  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference."  Id.  Thus, to be held liable, the official's actions must be the result of more than mere negligence, and, rather, state policymaking officials must make deliberate, callous decisions which evince a willingness to ignore a known, foreseeable danger. Morse, 132 F.3d at 910-11.

The City argues that in the present action, there is no evidence in this record that the City was aware that Mr. and Mrs. Holmes posed an excessive risk of sexually and/or physically abusing J.H.  Certainly, both J.H. and his adoptive father, D.J., acknowledge that they did not inform the City about abuse by Mr. or Mrs. Holmes.  Even if the City had been aware of some level of risk, there is no evidence that the City attempted to conceal the risk or otherwise acted with deliberate indifference to the risk.  Instead, the record supports a finding that the City promptly investigated the single instance of allegations of abuse and, based in part on J.H.'s own statements, determined them to be untrue.  Even if the City's case worker and Tabor's Cluster Director reached the wrong conclusion regarding the alleged abuse, the City argues that the most

16

that can be said is that they were negligent.

J.H. asserts that the City's behavior shocks the conscience.  J.H. notes that after investigating J.H.'s brother's report of abuse by Mr. and Mrs. Holmes, the City took no affirmative steps thereafter to more closely monitor J.H.'s care by either increasing the frequency of its visits to the Holmes residence or by more closely scrutinizing the monthly reports submitted by Tabor.  J.H. argues that "[p]rudence dictates that even one report of suspected child abuse [ – and, presumably, even if that report is erroneous or without merit –] should produce, in the short time at the very least, more intense monitoring of the relationship in question.  The adage, 'where there is smoke, there is fire,' is particularly apt in such situations."  Response at 14-15.  However, J.H. provides no legal support for his assertion that the City had an obligation to increase its monitoring of a child already being regularly monitored by an experienced agency with which the City had contracted to perform just such oversight.

The City replies that its failure to increase monitoring activities based on an unfounded report of abuse does not create a question of fact regarding whether the City's conduct shocks the conscience.  Failing to change its monitoring activities after determining that J.H.'s brother's allegations were untrue does not constitute acting with deliberate indifference to a known risk.  To be held liable under § 1983, an official's actions must be the result of more than mere negligence.  Morse, 132 F.3d at 911 (3d Cir. 1997).  J.H. concedes that there is no evidence that the City's investigation into his brother's allegations of abuse was a "sham."  Accordingly, the Court finds no evidence that the City acted inappropriately or that the actions it did take in any way "shock the conscience."

**3.** **Whether the City Affirmatively Used Its Authority to Create a Danger to J.H. and to Render Him More Vulnerable to Danger**

17

The fourth element of the state-created danger doctrine requires J.H. to establish that a City agent affirmatively used his or her authority in a way that created a danger to J.H. or rendered him more vulnerable to danger than if the agent had not acted at all.  The City argues that there is no evidence that D.H.S. had any involvement in J.H.'s placement with Mr. and Mrs. Holmes, and no other arguable use of state authority.  Because there is no evidence that D.H.S. affirmatively used its authority to place J.H. in harm's way, J.H.'s state-created danger claim must fail as a matter of law, according to the City.

J.H. asserts that the City's analysis of this claim ignores the proper inquiry.  "[T]he question is whether DHS has any involvement in J.H.'s ***continued*** placement with the Holmes, particularly after it received notice of J.H.'s brother's report of abuse by the Holmes."  Response at 15 (emphasis in original).  J.H. asserts that the facts are undisputed that the City failed to act reasonably to satisfy itself that J.H.'s continued placement with the Holmes would not render him more vulnerable to danger.  He argues that the City's investigation of the report did not satisfy its obligations under this element of the test.

The City replies to J.H.'s arguments by asserting that in order to "establish a state-created danger claim, J.H. must put forth evidence that a state actor affirmatively used his or her authority in a way that created a danger to J.H., or that rendered him more vulnerable to danger than had the state not acted at all."  Defendant City's Reply in Support of Motion for Summary Judgment ("Reply") at 6 (citing Sanford, 456 F.3d at 304-05) (emphasis in original).  The City notes that J.H.'s contention is that "the City took no affirmative steps after investigating J.H.'s brother's report of abuse against the Holmes[es] to more closely monitor the Holmes[es]' treatment of J.H. either by increasing the frequency of its visits to the Holmes residence or by more closely scrutinizing the monthly reports submitted by Tabor."  Reply at 6.

18

The City asserts that J.H.'s description of his own claim reveals a fatal flaw: the claim is not based on the City's taking any affirmative action which placed J.H. in danger. "It is the misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause." Bright v. Westmoreland County, 443 F.3d 276, 282 (3d Cir. 2006). The City argues that because J.H. cannot identify an affirmative act which rendered him more vulnerable to danger, J.H.'s state-created danger claim must fail. See, id. at 284 (holding that "[l]iability requires affirmative state action; mere 'failure to protect an individual against private violence' does not violate the Due Process Clause" and quoting Deshaney v. Winnebago County Dep't of Social Services, 489 U.S. 189, 197 (1989)); Henry v. Philadelphia Adult Probation and Parole Dep't, 2007 U.S. Dist. LEXIS 66247, at *26-27 (E.D. Pa. Sept. 6, 2007) (bare assertions or conclusory allegations that the City affirmatively placed the decedents in a position of danger by creating and implementing policies or customs is insufficient to create an issue of fact regarding the affirmative act prong of the state-created danger test). Because the City took no affirmative action that placed J.H. in danger, the City cannot be held liable under the state-created danger doctrine.

**4.      Whether the City's Alleged Violation of the State-Created Danger Doctrine Was the Result of a City Custom or Policy**

Even if J.H. put forth sufficient evidence to create a genuine issue of material fact under the state-created danger doctrine, the Court would be required to engage in a Monell analysis to determine whether the violation was the result of a City custom or policy. See, Sanford, 456 F.3d at 314. The City argues, without much in the way of analysis, that there is no evidence that the alleged violation was the result of a municipal policy or custom or that any municipal policy or custom itself caused the purported violation.

J.H. responds by identifying relevant information from Charlene Wright's testimony. Specifically, J.H. notes that Ms. Wright testified that City policy regarding children in foster care placement was (1) to review the monthly reports submitted by social workers for the agency that placed the child (here, Tabor), and (2) to visit the child at his foster home at least once every six months. Wright Dep. at 25-28. J.H. asserts that there is no evidence that the City deviated from this policy even after receiving notice via J.H.'s brother of suspected child abuse. Accordingly, J.H. argues that the City's failure to deviate from its policy or custom resulted in further abuse against J.H.

The City replies noting that "J.H. does not contend that the standard monitoring policy was, itself, unconstitutional. Rather, he contends that the City should have deviated from the policy after receiving the report." Reply at 7. The City argues that any failure to deviate from a standard policy based on an unfounded report of abuse cannot create a new policy or a direct causal link between the policy and the alleged violation. Because this is not a case in which the City received a substantiated report of abuse but failed to act, the Court must agree. Here, the City learned of a single report of abuse, investigated the allegation, and determined that the allegation was unwarranted. To hold the City liable for deciding not to use scarce resources on a case in which D.P.W. declined to investigate, and where the City and Tabor both concluded that the allegations were unfounded, would be inappropriate. Accordingly, the Court finds that J.H. cannot maintain a claim against the City under the state-created danger doctrine.

### c.    The City's Alleged Failure to Train and Failure to Supervise

J.H.'s third theory of due process liability is that the City deliberately and recklessly established and maintained a custom, practice or policy of a) failing to properly train and

20

supervise its employees and agents; b) failing to properly investigate foster care parents; and c) failing to supervise foster care placements.  J.H. alleges that such failures directly caused him harm.

Because the duty to protect J.H. could only have arisen under the special relationship or state-created danger doctrines, Pearson, 988 F. Supp. at 853-54 (there is no duty to protect citizens from private actors absent the application of either the special relationship doctrine or the state-created danger doctrine), the custom or policy of failing to train or failing to supervise that J.H. identifies must, necessarily, have caused a violation of his rights under one of those two doctrines.  For the reasons stated above, the Court must dismiss J.H.'s due process claims under both the special relationship doctrine and the state-created danger doctrine.  Accordingly, his claim for failure to train and failure to supervise also must fail.

However, assuming that J.H.'s claim does not fail for this reason, it must also fail because J.H. has introduced no evidence that City officials were aware that an unreasonable risk existed for J.H. or that any official was indifferent to any risk actually faced by J.H.  In order to establish liability under a failure to train or supervise theory, J.H. must identify:

> specific supervisory practice or procedure that [the municipality] failed to employ and [establish] that (1) the existing custom and practice without that specific practice or procedure created an unreasonable risk of [the violation], (2) [officials were] aware that this unreasonable risk existed, (3) [officials were] indifferent to that risk, and (4) [the employee's] failure to assure that [the plaintiff's constitutional violation] received meaningful consideration resulted from [the municipality's] failure to employ that supervisory practice or procedure.

Sample v. Dieck, 885 F.2d 1099, 1118 (3d Cir. 1989) (addressing a failure to train allegation regarding the incarceration of a prisoner beyond the term of his sentence).

An unrealistic risk will normally be shown by evidence that the alleged harm has

occurred on numerous occasions. Id.  A claim of municipal liability based on a policy of inadequate training or supervision cannot be based on one incident of misconduct unless proof of the incident includes proof that it was caused by an existing unconstitutional policy.  City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985).  J.H. has identified one alleged failure by the City, the failure to increase oversight of his foster placement following a single, unsubstantiated allegation of abuse.  Even assuming that such action constituted a single incident of misconduct, J.H. has failed to present any evidence that the City's policy of reviewing foster agencies' reports monthly and visiting foster children at least twice a year was in any way unconstitutional.

Similar to unreasonable risk, deliberate indifference may be demonstrated by evidence that the municipality failed to respond appropriately in the face of an awareness of a pattern prompted by similar harm.  Berg v. County of Allegheny, 219, F3d 261, 276 (3d Cir. 2000).  The plaintiff, however, must establish more than a mere failure to act or investigate.  Stoneking v. Bradford Area School Dist., 882 F.2d 720, 730 (3d Cir. 1989).  Here, J.H. has not identified any awareness by the City of any pattern of similar harm.  Even when viewing the facts in the light most favorable to J.H., the Court finds no evidence that the City acted with deliberate indifference.  Accordingly, the Court will dismiss J.H.'s claim for failure to train and failure to supervise.


**IV. CONCLUSION**

For the reasons set forth above, the Court will grant summary judgment on all claims for the City of Philadelphia.

BY THE COURT:


<u>S/Gene E.K. Pratter</u>
GENE E.K. PRATTER
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **J.H. and D.J.,** | : | **CIVIL ACTION** |
| **Plaintiffs** | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILADELPHIA, et al.,** | : | **No. 06-2220** |
| **Defendants.** | : | |

## <u>ORDER</u>

AND NOW, on this 19th day of August 2008, upon consideration of Defendant City of

Philadelphia's Motion for Summary Judgment (Doc. No. 23), Plaintiffs' Response (Doc. No. 31),

and Defendant City's Reply (Doc. No. 32), and following oral argument, it is hereby ORDERED

that the Motion is GRANTED for the reasons set forth at length in the accompanying

Memordandum.

BY THE COURT:

<u>S/Gene E.K. Pratter</u>
GENE E.K. PRATTER
United States District Judge

24